J-S52035-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| v. | : | |
| | : | |
| DONALD N. MILLER, | : | |
| | : | |
| Appellant | : | No. 2448 EDA 2015 |

Appeal from the Judgment of Sentence March 9, 2015,
in the Court of Common Pleas of Philadelphia County,
Criminal Division, at No: CP-51-CR-0005060-2014

BEFORE:    FORD ELLIOTT, P.J.E., STABILE and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:        **FILED SEPTEMBER 14, 2016**

Donald N. Miller (Appellant) appeals from the judgment of sentence imposed following his convictions for, *inter alia*, first-degree murder.  We affirm.

The trial court summarized the evidence as follows.

[O]n May 17, 2013, [Appellant entered] his car parked on the 1400 block of Dover Street in North Philadelphia, and drove down Dover Street, turning onto Jefferson Street near 28th Street.  As he drove down Jefferson Street, he followed the decedent, Abdullah Dancy [(Dancy)], who was driving a dirt bike, and a friend of the decedent, who was driving an ATV. When Dancy turned onto Marston Street, [Appellant] slowed his car, put his arm out the window and shot at [Dancy] six times. [Appellant] then drove to the corner, turned down Etting Street and circled around again to the same spot on Dover Street from where he started.  [Dancy] was transported to St. Joseph's Hospital by his friends.  According to the statement of Jerome King [(King)], one of those friends, when [Dancy] was asked who did this to him, Dancy replied he saw [Appellant's] car.  This entire event was captured on several surveillance videos as well as witnessed by two women sitting on a bench at Marston and Jefferson Streets.

*Retired Senior Judge assigned to the Superior Court.

Trial Court Opinion (TCO), 10/27/2015, at 3 (citation omitted).

On March 9, 2015, following a jury trial, Appellant was convicted of first-degree murder, carrying a firearm without a license, carrying a firearm in a public place, and possessing the instrument of a crime. That same day Appellant was sentenced to life imprisonment with three concurrent terms of two and one half to five years' incarceration. Appellant timely filed a post-sentence motion, which was denied by operation of law on July 14, 2015. Appellant timely filed his notice of appeal, and thereafter a court-ordered concise statement of errors complained of on appeal.

On appeal, Appellant challenges the sufficiency of the evidence to sustain his convictions for murder and "possession of the firearm used in [a] murder,"[1] as well as the trial court's failure to grant a mistrial and issue a curative instruction. Appellant's Brief at 7.

We begin with Appellant's sufficiency challenge, mindful of our standard of review.

> The standard we apply in reviewing the sufficiency of the
> evidence is whether viewing all the evidence admitted at trial in

---

[1] Based on Appellant's charges, we presume he is referring to his conviction for possession of the instrument of a crime. "A conviction for possession of an instrument of crime requires the Commonwealth to prove that a defendant possessed an instrument that is commonly used for criminal purposes, under circumstances not manifestly appropriate for lawful use, with the intent to employ it criminally." *Commonwealth v. Foster*, 651 A.2d 163, 165 (Pa. Super. 1994).

the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Further, in viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the court must give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Harden*, 103 A.3d 107, 111 (Pa. Super. 2014) (internal quotation marks and citations omitted). "Evidence is sufficient to sustain a conviction of first-degree murder where the Commonwealth establishes that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with premeditation or deliberation." *Commonwealth v. Spotz*, 759 A.2d 1280, 1283 (Pa. 2000).

Appellant claims the evidence was insufficient because

the only piece of evidence against Appellant was a piece of mail inside the alleged vehicle used in the shooting, there was no

- 3 -

firearm recovered, the only eye witness, Linda Harris said she was 'not sure,' another piece of mail in the vehicle was to a Lamar Campfield (who is awaiting trial for a separate murder), the shooter was described as [having] 'light skin' and no 'facial hair,' while Appellant has facial hair including a goatee, sideburns, and a mustache, and [] Appellant had an alibi.

Appellant's Brief at 8.

Referring to Appellant's summary of the evidence as "quixotic," the trial court found sufficient evidence existed to sustain Appellant's convictions.

The prosecution commenced with the testimony of Philadelphia Police Officer Javier Montanez, who on May 17th of 2013, responded to a radio call of a man with a gun, and while responding, encountered a red Mercury Grand Prix at St. Joe's Hospital. In the vehicle were Martell Lewis and Robert Jackson, who had just driven to the hospital with [Dancy], who was suffering from a gunshot wound to the back. Dancy had been placed on a stretcher to be transported to the trauma unit at Hahnemann Hospital. [King] was the second witness presented. [King] was about four blocks away when he heard gunshots and received a phone call about the shooting, [and] then ran to the scene to see [Dancy] laying shot in the street. King helped get Dancy into the car and helped transport the [him] to the hospital. []King had previously provided a statement to homicide in which King stated that he had asked [Dancy] when being transported to the hospital who shot him, to which [Dancy] replied that he had seen Donald's car. King identified the [Appellant] as the Donald whom [Dancy] was referring to, and the gold Chevy Impala as the car [Appellant] drives.

Beverly Downs was then called by the prosecution[. She] testified that she was with Linda Hawthorne Flamer, seated on a bench on Jefferson Street on May 17, 2013, at the time of the shooting. Ms. Downs had seen the two motorcycles come down Jefferson Street and one of them turn onto Marston Street. Although Ms. Downs' memory of the events that evening were [sic] less than crystal clear, she had provided the police with a

statement on the night of the occurrence. Ms. Downs saw a gold colored car come up behind the motorcycle and after the motorcycle turned the corner on to Marston Street, she heard what she believed to be a vehicle backfire. Ms. Downs realized that what she heard were gunshots when she saw people hollering on [Marston] Street. Ms. Downs identified [Appellant] from a photo array, as well as at the preliminary hearing, as definitely looking like the driver of the car behind the motorcycles, and stated that she had seen him around the neighborhood. Ms. Downs also identified [Appellant] to her friend, Linda Hawthorne Flamer, as the driver of the gold automobile.

Ms. Flamer's testimony was also presented to the jury. Likewise reluctant to testify, Ms. Flamer confirmed that while she was on the bench at Jefferson and Marston, two "scooters" rode down the street and turned down Marston. As they turned down the street, a car with a single occupant pulled up and shot at the boys on the motorcycles. The driver looked at the two women on the bench and then proceeded to Etting Street where he turned right. Ms. Flamer identified [Appellant] as the driver of the gold vehicle that shot at the two males on the motorcycles. Ms. Flamer was taken to homicide where she gave a statement and identified [Appellant] from a photo array. Ms. Flamer also told homicide that she saw the old brown car stop, and inside was a brown skinned, young guy in the car with a gun. Ms. Flamer identified [Appellant] at trial, indicating that he looked a little different from the date of the incident.

Officer Jason Orkin is a Philadelphia Police Officer who is assigned to the Real Time Crime Center, which is a unit that controls the police cameras throughout the city. Officer Orkin testified that he was working that unit on the night of the incident and observed the recording of the two males driving their motorcycles on Jefferson Street followed by a gold Chevy Impala. He observed the two males make a left turn and the driver of the gold Impala put his hand out the window with what appeared to be a gun. Detective Thursten Lucke next testified that he is assigned to the homicide division with a specialty of recovering and analyzing digital video surveillance footage, and he has been trained by the FBI. Detective Lucke provided a video of the entire crime, from when [Appellant] got into the

gold Impala, went around to Jefferson Street, followed the two males on motorcycles, pulled up behind them, stuck his arm out the window and shot the males and then drove back to where he started.

Clearly this evidence was more than sufficient to sustain the convictions in this matter. There is a video of the entire incident from beginning to end. There is a declaration by the decedent [(Dancy)] identifying [Appellant's] car as being involved in the shooting and two eyewitnesses to the shooting who testif[ied] they were right at the scene of the shooting [and] saw the shooting. The shooter turned and looked at them and drove off[. The eyewitnesses knew] the shooter from the neighborhood and [that Appellant was] the shooter.

TCO, 10/27/2015, at 5-7 (citations omitted).

We agree with the trial court that, when the evidence is viewed in a light most favorable to the Commonwealth, it sufficiently demonstrates that Appellant was the driver of the vehicle and the individual who shot Dancy. Conversely, we cannot agree with Appellant that the evidence was as unreliable and speculative as he claims. *See Commonwealth v. Hughes*, 908 A.2d 924, 928 (Pa. Super. 2006) ("[T]he evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances"). Accordingly, Appellant's sufficiency challenge fails.

Next we consider Appellant's claims related to the trial court's failure to grant a mistrial. In so doing, we note the following standard which governs our review of such claims:

> In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, … assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.
>
> The remedy of a mistrial is an extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.

***Commonwealth v. Judy***, 978 A.2d 1015, 1019 (Pa. Super. 2009) (internal quotation marks and citation omitted).

Appellant first argues that the trial court erred in "not granting a mistrial since Juror No. 1 was a friend of Appellant's cousin, Devon Smith, and spoke with Mr. Smith after being seated as a juror" and another juror

was friends with a member of Dancy's family. Appellant's Brief at 7. Appellant contends the court's failure to grant a mistrial was an "abuse of discretion since [] Appellant was denied a fair trial, free from prejudice before a neutral fact finder." *Id.* at 11.

We note at the onset that Appellant has failed to develop any meaningful argument regarding the "prejudice" he proclaims to have suffered; nor has he provided any citation to the record as evidence that he made the trial court aware of the alleged issues with impaneled jurors. Most notably, he fails to indicate where in the record he moved for a mistrial.[2]

In response to these bald assertions, the trial court contends that it scoured the record and found the issue had not been preserved for appeal. "The record not only lacks support for [Appellant's] allegations, but is void of any reference to these allegations." TCO, 10/27/2015, at 3.

We agree. Like the trial court, we too are unable to find where within the record this issue was raised before the trial court, and therefore properly preserved for this Court's review. "An issue that is not properly briefed in this manner is considered waived, as such an omission impedes our ability to

---

[2] *See Commonwealth v. Einhorn*, 911 A.2d 960, 970 (Pa. Super. 2006) citing *Commonwealth v. Drake*, 681 A.2d 1357, 1360 (Pa. Super. 1996) ("An appellate brief must provide citations to the record and to any relevant supporting authority. This Court will not become the counsel for an appellant, 'and will not, therefore, consider issues ... which are not fully developed in [the] brief.'")

address the issue on appeal." ***Commonwealth v. Einhorn***, 911 A.2d at 970 (citations removed). Consequently, this issue is waived.

Lastly, "Appellant contends [Detective Bass's] reference to being a member of the fugitive squad was improper and a curative instruction should have been required." Appellant's Brief at 12. The trial court's failure to grant a mistrial or issue a curative instruction was an abuse of discretion "since Appellant was denied a fair trial, free from prejudice before a neutral fact finder."[3] ***Id.***

Appellant takes issue with the following testimony offered by Detective Bass.

> [The Commonwealth:] Do you currently have a special role within the homicide unit?
>
> [Detective Bass:] Yes, I do. Within the homicide unit I'm assigned to the fugitive squad of the homicide unit.
>
> [The Commonwealth:] Before that did you work as a regular line homicide detective?
>
> [Detective Bass:] For the 16 years before I was assigned to the fugitive squad I did the regular line investigations as well as special investigations, known as case investigations.
>
> [The Commonwealth:] What is the job of the fugitive unit?
>
> [Detective Bass:] Our job in the fugitive squad is – [the] other two squads I mentioned to you, the line squad, which are the new cases of murder and the special investigations, which are

---

[3] Again, Appellant baldly asserts that he was prejudiced and denied a fair trial, but fails to make any argument or cite any authority to support his claims.

the older cases of murder, those detectives do the investigations as to who may or may not have committed this crime. When they find out who did it, they get arrest warrants with approval through the district attorneys. They hand it over to our squad. Our job is to try to find the person wanted for the warrant.

N.T. 3/6/2015 at 84.

It has been well established by our courts that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). After a review of the record, we agree with the trial court that Appellant has not properly preserved this issue. Specifically, in reviewing the applicable portion of the transcript, we find no objection, motion for a mistrial, or request for a curative instruction made by Appellant following Detective Bass's testimony. No relief is due.

Thus, after a thorough review of the record and briefs in this case, we are unconvinced that any of Appellant's arguments entitles him to relief.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.

Prothonotary

Date: 9/14/2016